WIGGINTON, Judge.
We are asked to review the trial court’s “Order of Adjudication-Disposition” finding that appellant (a minor) was not guilty of the charge of DUI manslaughter but nonetheless did commit the felony offense of vehicular homicide in violation of Section 782.071, Florida Statutes (1987). Concluding that no action other than supervision in appellant’s home was required, the court withheld adjudication of delinquency and placed him on a community control program subject to enumerated special conditions. Because we hold that the state failed to prove beyond a reasonable doubt that appellant committed the offense of vehicular homicide, we reverse.
The issue to be decided is whether appellant’s conduct was at most merely negligent and not so reckless as to amount to vehicular homicide. “Vehicular homicide” is defined in section 782.071 as
*324 ... the killing of a human being by the operation of a motor vehicle by another in a reckless manner likely to cause the, death of, or great bodily harm to, another. Vehicular homicide is a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
In McCreary v. State, 371 So.2d 1024 (Fla.1979), the supreme court held that the legislature created the offense of vehicular homicide “to cover the hiatus between section 782.071 [sic] manslaughter and the traffic offense of reckless driving....” Id. at 1027. Thus, the legislature made punishable as a third-degree felony “reckless driving which results in the killing of a human being where the degree of negligence falls short of culpable negligence but where the degree of negligence is more than a mere failure to use ordinary care.” [Footnote omitted.] Id. at 1026.
An examination of the evidence considered by the trial court sitting without a jury discloses that on the night in question appellant, who had just turned age 16 and received his driver’s license, set out after dinner with friend Tad Lindsay in his father’s new Blazer to visit friends staying at the beach. While en route, the boys purchased two six packs of “lite” beer. Appellant drank three to five of these beers over the course of the evening, A little after 10:00 p.m., the boys started for home traveling on the Old Gulf Beach Highway, a road with which appellant was unfamiliar.
It was a clear June night and there was no evidence of other traffic on the quiet rural stretch of the two-lane highway. Appellant passed a lounge at about 10:30 p.m. They were on a straightaway but a curve lay ahead to the east. Testimony of two witnesses leaving the lounge at the time appellant passed was conflicting as to appellant’s operation of the vehicle. One witness stated that when the Blazer approached from the west, it was coming at a rate of speed greater than the posted speed limit of 45 miles per hour and that it was “fishtailing.” [1] To the contrary, the other witness testified that the Blazer was not swerving at all and was in its proper lane, but, as it entered the curve, it went off the edge of the pavement. Tad Lindsay estimated their speed just prior to entering the curve as “around 50 to 55,” and that he had no sense whatsoever that their speed was dangerous or excessive. He testified that only the right hand wheel eased off the shoulder but that appellant returned the Blazer back onto the pavement as they moved into the curve.
However, coming from the opposite direction and out of a long straightaway was the victim, James O. Houghton, driving with a blood alcohol level later determined by the medical examiner to have been .19 percent at the time of the wreck, or nearly twice the level at which his faculties presumably would have been impaired. See Section 316.1934(2)(c), Florida Statutes (1987). Just seconds after the Blazer was fully back onto the pavement and further into the curve, the two cars collided. Trooper Thomas Verge, the traffic homicide investigator, testified that in his opinion both had been traveling at the speed limit of 45 miles per hour, “plus or minus a little bit.”
The wrecked vehicles came to rest partially on the shoulder of what had been the victim’s side of the road. Tad suffered only a minor wrist fracture, but appellant received a closed head injury as a consequence of which he suffered amnesia and was unable to testify at the trial. James Houghton met his death.
Although the trial court found that the point of impact was in Houghton’s lane, it was Tad’s testimony, as a state witness, that the Houghton vehicle just seconds before the accident had crossed the center line and appeared to be about a foot or two in appellant’s lane. Trooper Verge equivocated on the point of impact, stating that “the approximate point of impact or the first indication that a collision had occurred was a gouge mark in the west bound *325 lane.... ” He also testified that he was not an accident reconstruction expert.
The trial court’s findings and rationale were set forth in open court and again in the final “Order of Adjudication-Disposition.” The court found that although Tad Lindsay was not misrepresenting the facts when he testified that it was the Houghton vehicle that crossed the center line, it rejected that eyewitness testimony for the reasons that the point of impact indicated appellant’s vehicle had moved over to the victim’s lane and that the accident happened so very fast when Tad’s eyes had been looking off to the right side of the road and did not return to observe the center line until almost at the moment of impact.
Having thus dealt with the matter of causation, the trial court went on to find that appellant operated the vehicle in a reckless manner likely to cause the death of, or great bodily harm to, another person as he entered the curve. The first reason for so finding was that appellant had consumed beer before the accident which the court found to be “an indication” raising a suspicion that his judgment was to some extent “affected.”[2] The second reason given by the court was that appellant, as he entered the curve, was exceeding the speed limit although “by how much, I don’t know.” The court also found that appellant apparently went off the road to the right whereupon the Blazer, as a result of “perhaps overcorrecting,” moved over into the victim’s lane. The court admonished appellant that he needs
... to be aware that sometimes you face hazardous conditions when you drive on unfamiliar roads; and therefore, you should be more careful....
[Y]ou should have been more careful when you were driving because you had not yet faced all the tough problems that those of us who have driven longer know how to respond to almost intuitively. You have not yet developed that intuition of driving.
We hold that the above set forth facts, though sufficient perhaps for a finding of simple negligence, do not amount to the operation of a motor vehicle in a reckless manner likely to cause the death of, or great bodily harm to, another. In doing so, we are mindful of the trial court’s prerogative as the fact-finder in this case, as well as the concomitant problem of analyzing any set of facts in light of the statutory language in order to arrive at a conclusion of vehicular homicide. For guidance, we know only from McCreary that the word “reckless” used in the vehicular homicide statute does not mean “culpable” as that term is used in the manslaughter statute and that the standard of proof for vehicular homicide is less than that for manslaughter. It then remains for the courts to attempt the seemingly arbitrary task of fitting the circumstances before them into that statutory framework. The difficulty, of course, lies in the meaning of “reckless.”
It has been held for purposes of jury instructions that the focus of the statute is not on the recklessness of the driving. Therefore, the jury need not be instructed that the reckless driving must also have been willful and wanton, since “[t]he adjectives ‘reckless’ or ‘willful and wanton’ by themselves are not significant because they are often used interchangeably.” [Footnote omitted.] Rushton v. State, 395 So.2d 610, 612 (Fla. 5th DCA 1981). Rather, “[t]heir significance is found in the phrases which they modify and in the acts which they proscribe.” Id. (emphasis in original.)[3] Hence, according to Rushton, the *326 conduct proscribed by the vehicular homicide statute is the operation of a motor vehicle in a reckless manner “likely to cause the death of, or great bodily harm to another.” Id. (emphasis in original). “Thus, to convict, the jury must find that the operation of the vehicle in question is such as is likely to cause the specific harm, i.e., death of or great bodily harm to another.” Id. Similarly, this court has found for purposes of jury instructions “no significant differences in meaning between driving a vehicle in willful or wanton disregard for the safety of other persons” and driving it “in a reckless manner likely to cause the death of or great bodily harm to another person,” Jackson v. State, 456 So.2d 916 (Fla. 1st DCA 1984).
However, it is also true that “vehicular homicide cannot be proven without also proving the elements of reckless driving.” [4] By the very fact that the offense of vehicular homicide has been described by the supreme court as involving a degree of negligence more than a mere failure to use ordinary care, the state must necessarily adduce evidence showing conduct at least sufficient to constitute reckless driving as that offense is defined in Section 316.019, Florida Statutes, as involving a “willful or wanton disregard for the safety of persons or property....” In turn, “willful” means “intentionally, knowingly and purposefully,” and “wanton” means with a “conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property.” Fla.Std. Jury Instr. (Misd.) (reckless driving). Thus, although a defendant need not have foreseen the specific circumstances causing the death of the particular victim, it is sufficient that he or she should have reasonably foreseen that the same general type of harm might occur if he or she knowingly drives the vehicle under circumstances that would likely cause the death of another. Accordingly, not unlike the analysis in Rushton is this Court’s discussion in M.C.J. v. State, 444 So.2d 1001 (Fla. 1st DCA 1984), wherein we affirmed an adjudication of delinquency for vehicular homicide noting that although M.C.J.
could not reasonably have foreseen the specific circumstances [of another vehicle’s sudden turn into her lane] causing her to swerve her automobile, ... she should have reasonably foreseen that the same general type of harm might occur if she knowingly drove her vehicle with defective brakes at excessive speeds.
Id. at 1005. Cf. Palmer v. State, 451 So.2d 500 (Fla. 5th DCA 1984) (Sharp, J., dissenting) (recognizing that most jurisdictions interpret similar criminal statutes using the word “reckless” as requiring proof of willful or wanton conduct where the conduct “must be intentionally embarked upon by the actor with the realization that it probably will cause injury to another.” 451 So.2d at 503); and State v. Ward, 374 So.2d 1128 (Fla. 1st DCA 1979) (in dicta, court noting that it would be possible for jury to find defendant to have been reckless for operating a vehicle knowing that he was subject to seizures).
To that end, we disagree with the trial court — which reviewed the jury instructions on reckless driving in reaching its conclusion — that the facts adduced by the state were sufficient to show that appellant embarked upon his homeward journey aware that the driving conditions would be such as to likely cause the death of or great bodily injury to another. The facts do show that although appellant had been drinking — a factor the trial court was entitled to consider[5] — there was no indication that his faculties were impaired to any degree. Indeed, prior to getting into the Blazer, in response to Tad’s inquiry, appellant assured Tad that he was in a condition to drive, and Tad later affirmed in his *327 testimony that he observed nothing about appellant’s behavior indicating that he was in any way impaired. That observation was bolstered by another witnesses’ testimony — one of the friends they had visited at the beach — that appellant appeared perfectly normal.
Although it was nighttime, the weather conditions were clear. True, appellant was exceeding the speed limit, but he was not “speeding” in the sense that other defendants in other vehicular homicide cases were speeding wherein the conviction was affirmed.[6] Further, notwithstanding the fact that appellant’s Blazer did drive off the shoulder of the road, there is no suggestion that such incident occurred because of any impaired judgment on appellant’s part from his having imbibed the beer. At most, as recognized by the trial court, appellant was in the victim’s lane of traffic because he was overcorrecting from having driven off the shoulder of the road. That is evidence only of simple negligence and not of willful or wanton conduct.
As this court has earlier noted,
... it does not follow, however, that every fatality, regrettable as it may be, is accompanied by and results from conduct warranting a criminal conviction.... Before one can be so condemned it must be established beyond and to the exclusion of every reasonable doubt that the defendant has been guilty of negligence of the character heretofore defined.
[Footnotes omitted.] Jackson v. State, 100 So.2d 839, 840 (Fla. 1st DCA 1958). Moreover, in Jackson we recognized the well-established principle in this jurisdiction “that criminal liability does not attach when the accused is by circumstances and conditions beyond his control and against his will, placed in the position and subjected to the conditions which resulted in the death with which he is charged.” Id. at 841. Here, the circumstantial evidence on which the state based its case could have just as reasonably suggested that appellant was propelled into the victim’s lane due to his losing control and overcorrecting caused by the Blazer’s slipping off the unusually steep (6-8 inches) shoulder drop-off.
It is clear from the court’s colloquy at the trial that it reached its conclusion based on appearance, supposition and speculation, and influenced by appellant’s inexperience as a driver. With that in mind, we rule that the proof adduced by the state did not establish beyond and to the exclusion of every reasonable doubt that appellant committed the offense of vehicular homicide. Accordingly, the “Order of Adjudication-Disposition” is hereby REVERSED and the cause REMANDED with directions that appellant be discharged.
SHIVERS, C.J., concurs.
WENTWORTH, J., dissents without written opinion.

. This witness later modified her description of "fishtailing" so as not to include driving that was either "wild” or “erratic.” Also, the Blazer’s "weaving” was not noticeable to her once it entered the curve.

. The court had earlier ruled that the evidence did not establish appellant's blood alcohol'content and did not prove beyond a reasonable doubt that appellant’s faculties were impaired for purposes of the DUI charge.

. In that regard, the Fifth District quoted the following language in Ingram v. Pettit, 340 So.2d 922 (Fla.1976):
“Our jurisprudence reflects the history of difficulty in dividing negligence into degrees.
The distinctions articulated in labeling particular conduct as ‘simple negligence,’ ‘culpable negligence,’ ‘gross negligence,’ and ‘willful and wanton misconduct’ are best viewed as statements of public policy. These semantic refinements also serve a useful purpose in advising jurors of the factors to be considered in those situations where the lines are indis *326 tinct. We would deceive ourselves, however, if we viewed these distinctions as finite legal categories and permitted the characterization alone to cloud the policies they were created to foster. Our guide is not found in the grammar, but rather in the policy of the state in regard to highway accidents.”

. Chikitus v. Shands, 373 So.2d 904, 905 (Fla.1979).

. Jackson v. State, 100 So.2d 839 (Fla. 1st DCA 1958).

. See, e.g., Byrd v. State, 531 So.2d 1004 (Fla. 5th DCA 1988) (estimated speed of 81 m.p.h. in a 45 m.p.h. speed zone with heavy traffic conditions); Hamilton v. State, 439 So.2d 238 (Fla. 2d DCA 1983) (defendant operating her vehicle in a residential area upwards of 50 to 60 m.p.h. in the presence of children where road was posted with both a 30 m.p.h. speed limit sign and a "SLOW-CHILDREN PLAYING" sign); Savoia v. State, 389 So.2d 294 (Fla. 3d DCA 1980) (vehicle driven, without braking, into rear of parked truck, moving the truck about 200 feet and stopping vehicle’s speedometer at 90 m.p.h'.).